IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JESSICA AILEEN CHARLIER,   )
    Plaintiff,      )
           )
  vs.        )  Civil Action No. 20-405
           )
ANDREW M. SAUL,     )
*Commissioner of Social Security*,  )
           )
    Defendant.    )

ORDER

AND NOW, this 30th day of June, 2021, upon consideration of Defendant's Motion for

Summary Judgment (Doc. No. 16), filed in the above-captioned matter on January 21, 2021,

IT IS HEREBY ORDERED that the Motion is DENIED.

AND, further, upon consideration of Plaintiff's Motion for Summary Judgment (Doc. No.

14), filed in the above-captioned manner on December 23, 2020,

IT IS HEREBY ORDERED that the Motion is GRANTED IN PART and DENIED IN

PART. Specifically, Plaintiff's Motion is granted to the extent that it seeks remand to the

Commissioner of Social Security ("Commissioner"), as set forth below, and denied in all other

respects. Accordingly, this matter is hereby remanded to the Commissioner for further

evaluation under sentence four of 42 U.S.C. § 405(g).

## I.  Background

Jessica Aileen Charlier ("Plaintiff") filed an application for Supplemental Security

Income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"), 42 U.S.C.

§§ 1381—1383f, on May 15, 2013. She alleged disability due to depression, bipolar disorder,

anxiety, chronic liver condition, hepatitis C, learning disability, attention deficit hyperactivity

disorder ("ADHD"), and anemia. (R. 239). After she was initially denied, she sought a hearing

before an Administrative Law Judge ("ALJ"), and the matter was presented to ALJ Joanna Papazekos on July 1, 2015. (R. 29). After the hearing, Plaintiff received an unfavorable decision, dated September 10, 2015. (R. 29—44). Plaintiff challenged the decision before the Honorable Donetta W. Ambrose, Senior United States District Judge, United States District Court for the Western District of Pennsylvania. Judge Ambrose concluded that the ALJ had erred in rejecting Plaintiff's treating psychiatrist's opinion because the ALJ failed to provide an adequate or clear reason for her rejection of that opinion. *Charlier v. Comm'r of Soc. Sec.*, No. 17-649, 2018 WL 2739848, at *2—3 (W.D. Pa. June 7, 2018). Accordingly, Judge Ambrose remanded the matter for additional administrative proceedings. On remand, Plaintiff's SSI application was consolidated with the subsequent SSI application she had filed while her case was pending before Judge Ambrose. (R. 704).

Back before the ALJ, Plaintiff appeared for two hearings. Medical experts were scheduled to testify at both, however neither expert proved helpful. The first medical expert's testimony concerning Plaintiff's mental health diagnoses was so contrary to the rest of the record, the ALJ afforded it "no weight." (R. 718). *Cf.* (R. 820—41 (Plaintiff's attorney objecting to the medical expert's testimony as "outrageous" for its inconsistency with earlier mental health diagnoses)). The medical expert scheduled to testify at the second hearing was unexpectedly unable to appear. (R. 789). Ultimately, the ALJ decided to forge ahead without a medical expert's testimony but with a much-developed record due, in part, to the consolidation of Plaintiff's two applications. Here again, the ALJ found that Plaintiff was not disabled. (R. 704—22). The Appeals Council did not assume jurisdiction of the matter, nor are any exceptions before them, therefore the ALJ's decision constitutes the Commissioner's final

decision.  20 C.F.R. § 416.1484(d).[1]  Plaintiff again filed her complaint with the district court

seeking judicial review of the Commissioner's non-disability determination, and now pending

before the Court are the parties' motions for summary judgment.  (Doc. Nos. 14—18).

## II.    Standard of Review

The Court seeks to resolve "whether the decision of the Commissioner to deny SSI

benefits is supported by substantial evidence."  *Mendez v. Chater*, 943 F. Supp. 503, 507 (E.D.

Pa. 1996) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The

Court exercises plenary review regarding questions of law.  *Hansford v. Astrue*, 805 F. Supp. 2d

140, 143 (W.D. Pa. 2011) (citing *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir.

1999)).  Substantial evidence is a deferential standard, requiring only "such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139

S. Ct. 1148, 1154 (2019) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Notwithstanding the considerably deferential standard, ALJs are dutybound "to hear and evaluate

all relevant evidence in order to determine whether an applicant is entitled to disability benefits."

*Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981) (citing 20 C.F.R. § 404.1503(a) (1980); 20

C.F.R. § 404.1502)).  Further, that thoroughgoing review must be reflected in an ALJ's decision,

lest reviewing courts be frustrated in their attempt to carry out the "statutory function of judicial

review."  *Id.* at 705.  The necessity of adequate explanation is particularly acute where an ALJ's

---

[1]    Plaintiff indicated she attempted to file exceptions but admits the Appeals Council does not have them, and Defendant acknowledges Plaintiff exhausted her administrative remedies. (Doc. No. 4, pgs. 1—2; Doc. No. 8, pg. 1).  Thus, the parties concede that the ALJ's decision is the Commissioner's final decision.

findings require her rejection of certain evidence because reviewing courts must ensure the ALJ

has not "reject[ed] evidence for no reason or for the wrong reason." *Id.* at 706.[2]

ALJs review the record pertaining to SSI applications to determine "disability," *i.e.*,

whether the claimant is unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or has lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. § 416(i)(1)(A). ALJs employ the familiar five-step evaluation to decide whether a

claimant suffers from a disability:

> In the first two steps, the claimant must establish (1) that he is not
> engaged in 'substantial gainful activity' and (2) that he suffers
> from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S.
> 137, 140–41, 107 S. Ct. 2287, 96 L.Ed.2d 119 (1987). If the
> claimant shows a severe medical impairment, the [Commissioner]
> determines (3) whether the impairment is equivalent to an
> impairment listed by the [Commissioner] as creating a presumption
> of disability. *Bowen*, 482 U.S. at 141, 107 S. Ct. 2287. If it is not,
> the claimant bears the burden of showing (4) that the impairment
> prevents him from performing the work that he has performed in
> the past. *Id.* If the claimant satisfies this burden, the
> [Commissioner] must grant the claimant benefits unless the
> [Commissioner] can demonstrate (5) that there are jobs in the
> national economy that the claimant can perform. *Ferguson v.
> Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Sherman v. Astrue*, 617 F. Supp. 2d 384, 393 (W.D. Pa. 2008) (citing *Jesurum v. Secretary of the*

*United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). Critical to

the ALJ's consideration of steps four and five is the ALJ's determination of a claimant's residual

functional capacity ("RFC"), which is "defined as that which an individual is still able to do

---

[2]    In *Cotter*, "there was expert medical testimony that was probative and supportive of
Cotter's claim which conflicted with the medical testimony accepted by the ALJ," but the ALJ
erroneously "fail[ed] to explain his implicit rejection of this evidence or even to acknowledge its
presence." *Id.* at 707.

despite the limitations caused by his or her impairment(s)." *Id.* at 394 (citing *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000)). It is the ALJ's province—and the ALJ's alone—to determine a claimant's RFC. *Id.* (citing 20 C.F.R. § 416.927(e)(2)).

### III. The ALJ's Decision

In her November 22, 2019 decision, the ALJ evaluated Plaintiff's consolidated record according to the five-step sequential evaluation process. (R. 705). First, she determined Plaintiff had not been engaged in substantial gainful activity ("SGA") since her initial application date. (R. 707). Next, she found Plaintiff suffered from sixteen severe, medically determinable impairments, both physical and mental.[3] At step three, the ALJ determined that none of Plaintiff's impairments nor any combination thereof met or medically equaled one of the listed impairments. (R. 708—10). Therefore, the ALJ proceeded to map out the extent of Plaintiff's functional limitations and remaining maximum work ability, *i.e.*, her RFC, to facilitate the final steps of the evaluation. (R. 710—21).

Considering Plaintiff's voluminous medical records, the ALJ determined that Plaintiff's RFC included the capacity to perform light work—defined at 20 C.F.R. § 416.967(b))—with

---

[3] The ALJ found the following severe, medically determinable impairments: (1) history of learning disorder; (2) bipolar disorder; (3) panic disorder with anxiety; (4) generalized anxiety; (5) obsessive compulsive disorder; (6) ADHD; (7) polysubstance use; (8) hepatitis C; (9) asthma; (10) obesity; (11) status post non-displaced minimally depressed facture of the left lateral tibial plateau; (12) medial compartment post-traumatic osteoarthritis, obesity, left knee; (13) status post arthroscopic surgery for complete anterior cruciate ligament tear and medial meniscal tear; (14) primary osteoarthritis, right knee; (15) degenerative disc disease, lumbar spine; and (16) type II diabetes mellitus. (R. 707). This doubled the number of severe, medically determinable impairments the ALJ found in 2015 when the ALJ had determined that Plaintiff suffered from eight severe, medically determinable impairments: (1) learning disability; (2) bipolar disorder; (3) panic disorder with anxiety; (4) obsessive compulsive disorder; (5) hepatitis C; (6) asthma; (7) obesity; and (8) atypical chest pain. (R. 31). The ALJ also considered Plaintiff's chest pain and right-hand pain at step two but concluded that the record did not support finding severe, medically determinable heart or right-hand impairments. (R. 707).

several limitations. (R. 710). Those limitations included avoiding hazards; total avoidance of "exposure to extreme concentration of cold, heat, wetness humidity, or pulmonary irritants, such as dusts, fumes, gases, or odors;" and no more than unskilled, entry-level work "in a stable work environment" with an unchanging workplace and work processes. (R. 710). The ALJ further found Plaintiff's work limitations should include a prohibition on work that "involve[s] traveling as an essential function of the job;" that any job Plaintiff held should involve decisions that "only use concrete variables in or from standardized situations;" and that she should only have "cursory interactions with co-workers and supervisors." (R. 711). The ALJ also included the following limitations: "[n]o face-to-face interactions with the public (telephone interaction is ok);" "[w]ork should be self-paced;" "[w]ork should [sic] require the attainment of precise tolerances, standards, or limits, for example no requirement for accurate measurements;" "[t]raining for up to but nor [sic] more than 30 days;" and lifting and carrying just "20 pounds occasionally, 10 pounds frequently with the ability to change position from being seated to being upright every 30 minutes." (R. 711).

To arrive at this RFC determination, the ALJ considered Plaintiff's testimony, the objective medical evidence, and opinion evidence. Considering Plaintiff's testimony, the ALJ noted that Plaintiff alleged "pain in both knees and in her back," which she indicated limited her to just five to ten minutes of standing before she would need to sit down for a break. (R. 711). She considered Plaintiff's testimony regarding her use of a cane and that she could only sit for thirty minutes at a time. (R. 711). The ALJ also considered Plaintiff's testimony that she had suffered from mental health disorders since childhood, resulting in difficulty reading, filling out disability forms, and performing calculations. (R. 711). Plaintiff further alleged, and the ALJ considered, that her "symptoms related to anxiety, bipolar disorder, OCD, ADHD, and PTSD"

6

resulted in flashbacks and difficulty following through on various tasks, processing her thoughts, concentrating, focusing, coping with her emotions, and interacting with people.  (R. 711—12).

Turning to the objective medical evidence, the ALJ first considered Plaintiff's mental health records, particularly those from her treating psychiatrist, Dr. Hiller.  (R. 712).  Dr. Hiller's treatment notes start in 2011 and end in 2016.  (R. 712).  The ALJ considered that from 2011 to 2015, the record indicated Plaintiff saw Dr. Hiller from as frequently as monthly to as infrequently as once every three months.  (R. 712).  During that time, Plaintiff followed a prescription drug regimen that included antidepressant, anti-anxiety, and antipsychotic medications.  (R. 712).  Dr. Hiller's treatment notes, to the extent they are legible, reflected his observations that Plaintiff at times presented with a "good," "pretty good," or "not as depressed mood," but also indicated she frequently experienced stress due to parenting and housing matters.  (R. 712).

The ALJ also considered Plaintiff's simultaneous treatment with a second psychiatrist, Dr. Kang, between 2011 and 2013.  (R. 712).  Dr. Kang saw Plaintiff semi-regularly and diagnosed Plaintiff with bipolar disorder.  (R. 712).  Around this same time (November 2012 to January 2013), Plaintiff was briefly incarcerated for a probation violation and subsequently resided in a drug rehabilitation facility with her children where she sought to address her "history of using heroin, crack cocaine, and marijuana."  (R. 712).  Like Dr. Hiller's notes, Dr. Kang's notes document Plaintiff's concerns about parenting and housing, and further indicate her improvement with appropriate medication adjustments.  (R. 713).

In May 2016, approximately three years after Plaintiff's treatment with Dr. Kang came to an end, Plaintiff entered another drug rehabilitation program to address a relapse.  (R. 713).  That same year, Plaintiff's treating psychiatrist, Dr. Hiller, died.  (R. 713).  After his death, Plaintiff

sought to continue her psychiatric medication regimen through the emergency department at UPMC Mercy Hospital. (R. 713). The hospital initially accommodated Plaintiff, but eventually informed her that she could not continue to obtain her prescriptions through the emergency department. (R. 713). She subsequently established care with a new mental health services provider[4] and later worked with her primary care physician ("PCP"), Dr. Zillweger, to maintain an appropriate prescription medication regimen. (R. 713—14). At the time of the ALJ's decision, Plaintiff continued to manage her medications with her PCP and also worked with a mental health therapist. (R. 714). With these records, the ALJ also briefly considered Plaintiff's GAF scores which ranged from 40 to 68 (R. 721), but explained that she would give these scores "little weight" as GAF scores are merely representative of a "snapshot" of a Plaintiff's subjective representation of her condition. (R. 721).

Considering this objective medical evidence of Plaintiff's mental health history, spanning 2011 to 2019, the ALJ determined that though Plaintiff suffered from "ongoing mental health conditions and symptoms," those conditions were manageable with consistent treatment. (R. 714). The ALJ found corroboration for this assessment in Plaintiff's daily activities which included living alone, caring for herself, and looking for work. (R. 714). The ALJ further considered medical opinion evidence that supported her findings,[5] as well as opinion evidence

---

[4]     When she initiated care with this provider in December 2016, Plaintiff was noted to be "cooperative and well-kempt in appearance," but demonstrated few other positive signs. (R. 713). After her medications were adjusted, she saw an improvement. (R. 714).

[5]     The ALJ assigned no weight to the opinion of Dr. McCain, the medical expert who appeared at the first hearing on remand and discounted every mental health diagnosis except substance abuse. (R. 718). She considered the State agency medical consultant's 2013 opinion, which would have limited Plaintiff to "medium exertional activity with environmental limitations," and assigned it little weight primarily because that examiner had not reviewed the evidence since 2013. (718). She afforded some weight to the 2013 State agency psychological consultant's opinion that mostly moderate mental functioning restrictions would be appropriate

that conflicted with her findings. As was appropriate in light of the remand order, the ALJ dedicated particular attention to explaining her rejection of certain medical opinion evidence, starting with Dr. Hiller's opinions. (R. 719).

In 2013, Dr. Hiller had opined that Plaintiff suffered from marked limitations in interacting with others, moderate limitations for "understanding, remembering, and carrying out" instructions, and "marked limitations with complex instructions and with making judgments on complex work-related decisions." (R. 719 (citing Ex. 6F at R. 407—08)). Dr. Hiller's 2016 opinion indicated Plaintiff's mental health and corresponding limitations had significantly worsened since 2013. Dr. Hiller maintained his opinion that Plaintiff suffered "marked limitations with interacting with others, as well as with functioning independently and following work rules." (R. 719 (citing Ex. 24F at R. 1241)). To that he added that Plaintiff now suffered from "extreme limitations with maintaining attention and concentration, behaving in an emotionally stable manner, and demonstrating reliability." (R. 719 (citing Ex. 24F at R. 1241)). He further opined that Plaintiff would "miss 10-12 days of work per month." (R. 719 (citing Ex. 24F at R. 1243)).

The ALJ afforded Dr. Hiller's findings, which were documented on forms that largely required Dr. Hiller to check a box corresponding to the limitations he found appropriate, only little weight. (R. 719—20). Generally, she found his recommended limitations to be overblown and inadequately supported. For instance, considering Dr. Hiller's 2013 opinion, the ALJ found the opined limitations were undermined by Dr. Hiller's treatment notes, which documented Plaintiff's anxiety but also her "good" and "pretty good" moods. (R. 719). Further, the ALJ

because that finding was "generally supported by the treatment notes, mental status exams, [Plaintiff's] course of treatment, and [Plaintiff's] ability to live alone." (R. 719).

pointed out that Dr. Hiller directly quoted Plaintiff instead of offering his own explanations for his opinions. (R. 719). Because Dr. Hiller directly quoted Plaintiff, his opinion lacked the expert analysis usually reflected in a treating physician's report. Therefore, the ALJ declined to afford the opinion much weight. (R. 719).

The same went for Dr. Hiller's 2016 opinion which again included many "direct statements from the claimant," which the ALJ found "suggests that the reported limitations may have been based largely on the claimant's responses." (R. 720). The ALJ also found the 2016 opinion "inconsistent with the treatment records" and, for these reasons, assigned little weight to it. (R. 720). Explaining her finding of inconsistency, the ALJ noted that Dr. Hiller's opinion in one instance indicates Plaintiff could successfully "manage her own benefits," but elsewhere indicates Plaintiff is severely limited in independent functioning and "maintaining attention and concentration." (R. 720 (citing Ex. 24F at R. 1241—42)). The ALJ was uncomfortable with this internal inconsistency, as well as with inconsistency among Dr. Hiller's opinion and other evidence in the record. For example, Dr. Hiller attributed none of Plaintiff's problems to drug abuse despite the fact that "she was in an inpatient drug treatment facility a few months prior to the date of this opinion." (R. 720). Additionally, Dr. Kang's records, which overlapped with Dr. Hiller's treatment of the Plaintiff, contradicted the severity of Dr. Hiller's findings—Dr. Kang found Plaintiff's "medications were working," at the same time Dr. Hiller opined Plaintiff's mental health symptoms were growing substantially worse. (R. 720). These were the considerations that went into the ALJ's determination that Dr. Hiller's proposed limitations for Plaintiff were excessive.

Concerning Plaintiff's physical health, the ALJ considered evidence of Plaintiff's hepatitis C, which had been diagnosed in April 2011 and addressed intermittently up until she

received an eight-week course of treatment in 2018. (R. 715). The ALJ also noted Plaintiff's pregnancies during that time. (R. 715). Plaintiff also suffered from asthma, which appeared to be controlled sufficiently as Plaintiff was able to walk for exercise and continued smoking. (R. 715 (citing Ex. 41F at 1607—08)). The ALJ considered evidence that Plaintiff suffered from a fall in 2015 resulting in injury to her left leg. (R. 716 (citing Ex. 22F at R. 1209)). The injury required Plaintiff to be treated with a knee immobilizer and crutches. She subsequently presented to emergency services with left knee pain in March 2016. (R. 716 (citing 26F at R. 1288)). When she appeared for an examination with an orthopedist in August 2016, she was observed to have four out of five muscle strength, but also an "acute tear of the ACL with medial meniscus tear and negative patellar tilt." (R. 716 (citing Ex. 27F at R. 1298)). At the time she was nevertheless able to maintain a "steady gait." (R. 716).

After undergoing "ACL reconstruction and partial medial menisce[c]tomy," the ALJ noted that Plaintiff's conduct constituted "complete noncompliance" with her course of treatment, such as delaying and then barely attending physical therapy. (R. 716). When, a year later, she "reported pain and frequent falling," she was assessed to have "full active range of motion of her knee and full 5/5 strength." (R. 716 (citing Ex. 44F at R. 1709—10)). However, just months later, in January 2018, imaging indicated progressive arthritis which would require a knee replacement. (R. 716 (citing Ex. 44F at R. 1713)). Other 2018 records—from Plaintiff's PCP—indicate a normal gait and normal range of motion in Plaintiff's extremities. (R. 717). In 2019 she was treated for arthritis in the right knee with steroidal injections. (R. 717 (citing Ex. 55F at R. 2105)).

The ALJ considered these records of Plaintiff's knee problems and further considered that Plaintiff was examined to determine the cause of low back pain in 2018 and 2019, at a time

when she had recently given birth.  (R. 717).  Though her gait appeared "antalgic" during a consultation with a neurosurgeon, examination revealed only a small lumbar disc protrusion with "mild narrowing of the canal."  (R. 717 (citing Ex. 45F at R. 1736)).  The ALJ also considered Plaintiff's obesity and type II diabetes mellitus—for which she was prescribed Metformin—as part of her consideration of Plaintiff's knee and back difficulties.  (R. 717).

As with Plaintiff's mental health impairments, the ALJ considered opinion evidence concerning Plaintiff's physical health after she considered the objective medical evidence. Plaintiff's PCP, Dr. Zillweger, opined that it would be appropriate to limit Plaintiff's standing to "10 minutes continuously, but not at all during an 8-hour work day."  (R. 720).  The ALJ found that to be "internally inconsistent."  (R. 720).  The ALJ was also bewildered by Dr. Zillweger's opinion concerning how Plaintiff might divide her time among standing, sitting, walking, and laying down, because the total time Dr. Zillweger allotted to those activities did not add up to eight hours.  (R. 720, 1822—23).  That oversight indicated to the ALJ that the limitations Dr. Zillweger opined were not "carefully considered," and, therefore, the opinion's value was limited.  (R. 720).  The ALJ was further assured of the opinion's limited value because she found Dr. Zillweger's opinion did not match his treatment records.  For instance, despite Dr. Zillweger's opinion, his treatment notes indicated that Plaintiff generally demonstrated "a normal gait, intact motor functioning, intact sensation, and normal range of motion in her extremities in 2018."  (R. 720).  The ALJ also found Dr. Zillweger's opinion did not agree with objective medical evidence in the record from around the same time.  (R. 720—21).

Though absent from the ALJ's decision, there is one more medical opinion in the record to address, that is, the June 26, 2017 State agency medical consultant opinion provided by Dr. Sarpolis, M.D.  (R. 935).  The opinion is partially consistent with the ALJ's RFC

determination—Dr. Sarpolis found Plaintiff would be limited to occasionally lifting or carrying twenty pounds but could frequently lift or carry ten pounds. (R. 933). However, she further found it would be appropriate to limit Plaintiff to four hours of standing and/or walking with normal breaks and opined that Plaintiff could sit six hours each day with normal breaks. (R. 933). She limited Plaintiff to avoiding pushing with her lower left extremity and to pull on the left only occasionally. (R. 933). She further recommended limitations pertaining to Plaintiff's postural capabilities and environmental exposure tolerance. (R. 933—34).

## IV.    Legal Analysis

Plaintiff submits two arguments to challenge the underlying decision. First, Plaintiff argues the ALJ erroneously rejected treating physician opinion evidence despite having been instructed to carefully explain her consideration of the opinion evidence on remand. Second, Plaintiff argues the ALJ's RFC findings lack the support of substantial evidence. The Court is unpersuaded by Plaintiff's first argument as the ALJ thoroughly considered and adequately explained her evaluation of the treating physician opinion evidence. However, the Court is persuaded by Plaintiff's second argument insofar as the Court finds the RFC determination does not enjoy the support of substantial evidence where the ALJ failed to consider all evidence in the record. That oversight requires remand despite the ALJ's otherwise thorough decision

*Treating Physician Opinion Evidence*

Plaintiff argues the ALJ should have afforded more weight to Dr. Hiller and Dr. Zillweger's medical opinions concerning Plaintiff's mental impairment limitations and physical impairment limitations, respectively. She argues that they were in the best position to opine on those limitations. (Doc. No. 15, pgs. 11—20). Notwithstanding the treating psychiatrist and

treating physician relationship they shared with Plaintiff, the ALJ afforded their opinions little weight.[6]

ALJs must consider all the evidence in the record, and they generally afford treating physician opinions special value. Assigning significant value to treating physician opinions falls under the treating physician doctrine according to which "a court considering a claim for disability benefits must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993).[7] These opinions are afforded special value because it is assumed they reflect the physician's "expert judgement based on a continuing observation of the patient's condition over a prolonged period of time." *Schonewolf v. Callahan*, 972 F. Supp. 277, 285 (D.N.J. 1997) (citing *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)). Accordingly, invoking the treating physician rule is most appropriate when the opinion includes the author's reasoning, *i.e.*, explanations and support for the opinions offered therein. *Cleinow v. Berryhill*, 311 F. Supp. 3d 683, 685 (E.D. Pa. 2018).

The treating physician doctrine is a helpful evaluative tool for ALJs to employ when they consider various medical opinions and evidence in the record. However, the ALJ never cedes her role as final arbiter of a claimant's RFC to a treating physician. *See Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (explaining that while treating physician opinions are highly

---

[6]     The ALJ afforded Dr. Hiller's 2013 and 2016 opinions "little weight" and described Dr. Zillweger's opinion as being of "reduce[d] . . . overall value." (R. 719—20).

[7]     For applications that were filed before March 27, 2017, treating physician opinions are afforded "controlling weight" if "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record." *Kirkpatrick v. Berryhill*, No. CV 18-1262, 2019 WL 7629242, at *1 n.1 (W.D. Pa. Sept. 10, 2019) (citing 20 C.F.R. § 416.927(c)(2)); *Sardina-Garcia v. Saul*, No. CV 19-1528, 2020 WL 5797949, at *1 n.1 (W.D. Pa. Sept. 28, 2020).

valued, determining a claimant's RFC is the ALJ's responsibility). Accordingly, ALJs may reject treating physician opinions as long as they identify contradictory evidence in the record and explain why the treating physician opinion(s) is not entitled to great weight. *Schonewolf*, 972 F. Supp. at 285 ("[A]n ALJ can reject the opinion of a treating physician if he or she explains on the record the reasons for doing so."); *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (explaining that ALJs' power to reject or discount treating physician opinions is only limited in that ALJs may not base that rejection on their "own credibility judgments, speculation or lay opinion."); *Mason*, 994 F.2d at 1067. Further, an ALJ's explanation for rejecting or discounting treating physician opinions can meet these standards even when there is no alternative physician's opinion in the record that supports every aspect of the ALJ's RFC determination. *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006) ("There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC. Surveying the medical evidence to craft an RFC is part of the ALJ's duties.").

Considering Plaintiff's consolidated SSI applications on remand, the ALJ evaluated three treating physician opinions—two provided by Plaintiff's treating psychiatrist, Dr. Hiller, and one from her PCP and PA, Dr. Zillweger and Ms. Wray. (R. 719—20). As summarized *supra* at Section III, Dr. Hiller's first opinion from 2013 indicated Plaintiff experienced several "marked" limitations arising from her mental health conditions. (R. 407—08). In 2016 he provided a second opinion wherein he again identified marked limitations but added several "extreme" limitations. (R. 1241). In the latter instance, he found Plaintiff to be extremely limited in the areas of "maintain[ing] attention/concentration," "behav[ing] in an emotionally stable manner," and "demonstrat[ing] reliability." (R. 1241).

The ALJ afforded both opinions "little weight" and proceeded to provide detailed explanations for why she found the opinions were not entitled to greater weight. (R. 719, 720). First, the ALJ found it odd that rather than provide his own analysis of Plaintiff's condition, Dr. Hiller directly quoted Plaintiff to support his findings. (R. 719—20). As Judge Ambrose explained in the 2018 order remanding this matter for further administrative proceedings, "[i]t is axiomatic that a treating psychiatrist must consider a patient's subjective complaints in order to diagnose a mental disorder." *Charlier*, 2018 WL 27398448 at *2. However, in her most recent decision, the ALJ emphasized that these opinions document little more than Plaintiff's subjective complaints. (R. 719—20). The ALJ's explanation in this regard is satisfactory.[8] Treating physician opinions are valued because they are thought to reflect expert observation and analysis of a claimant's condition over time—that is why they are considered to be particularly strong evidence when the treating physician explains his or her reasoning. *Cleinow*, 311 F. Supp. 3d at 685. Dr. Hiller's opinions lack his own reflections on Plaintiff's complaints and therefore read more like transcripts than expert opinions. Without supporting explanations other than Plaintiff's statements, the two opinions are largely reduced to checkmarks, and check-box evidence is considered "weak" at best. *Mason*, 994 F.2d at 1065 ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."); *Zonak v. Comm'r of Soc. Sec.*, 290 F. App'x 493, 497 (3d Cir. 2008).

---

[8]     Judge Ambrose expressed concern that the ALJ's first decision—particularly as regards Dr. Hiller's 2013 opinion—was "non-specific and circular." *Id.* This was largely due to the ALJ's failure to explain why she appeared to accept that evidence to the extent it supported limiting Plaintiff's interactions with the public, but reject the same evidence to the extent it limited Plaintiff's interactions with supervisors. *Id.* On remand, the ALJ included limitations for Plaintiff's interaction with the public, coworkers, and supervisors in the RFC. (R. 710—11).

Moreover, Dr. Hiller's overreliance on Plaintiff's subjective complaints for the explanations in his opinions was not the ALJ's only reason for affording Dr. Hiller's opinions diminished weight.  The ALJ also found Dr. Hiller's opinion evidence inconsistent with other evidence in the record.  For instance, in the 2016 opinion, Dr. Hiller indicated substance abuse was not a contributing factor to Plaintiff's limitations despite Plaintiff's "long history of drug abuse" and stay in an "inpatient drug treatment facility a few months prior to the date of this opinion."  (R. 720).  The ALJ also noted internal inconsistency, such as Dr. Hiller indicating Plaintiff was extremely limited in the areas of attention and concentration while also indicating she could "manage her own benefits."  (R. 720).  The Court is satisfied with the ALJ's explanation of her decision to afford Dr. Hiller's opinions only little weight.

Considering the ALJ's treatment of Dr. Zillweger's opinion, the Court is similarly satisfied.  Dr. Zillweger opined that Plaintiff ought to be limited to lifting no more than ten pounds[9] and would be significantly limited in sitting, standing, walking, climbing, pushing, and pulling.  (R. 1822—23).  He also estimated that Plaintiff would miss between five and ten days of work every month.  (R. 1824).  The ALJ "appreciate[d] from these comments that Dr. Zillweger . . . [found] that the claimant has very significant limitations with standing, sitting, and walking."  (R. 720).  However, the ALJ found Dr. Zillweger's limitations conflicted with treatment records from around the same time.  Those records indicated that though Plaintiff had an antalgic gait, she retained full strength.  (R. 720—21).  The ALJ also explained that the opinion's internal inconsistency influenced her consideration of the opinion's substance.  As discussed in Section III, the ALJ was bothered that Dr. Zillweger opined that Plaintiff could

---

[9]     Compared to the ALJ's twenty-pound limit for occasional lifting and ten-pound limit for frequent lifting.  (R. 711).

stand for ten minutes but also not at all (R. 720), and she questioned how "carefully" Dr. Zillweger considered his opinion when the time he allotted for Plaintiff to lay down, sit, stand, and walk did not add up to a full day. (R. 720). The Court finds no fault in that thorough and specific explanation of the ALJ's decision not to afford Dr. Zillweger's opinion more weight.[10]

The Court also rejects Plaintiff's argument that, to justify rejecting Dr. Hiller and Dr. Zillweger's opinions, the ALJ was required to identify a contrary opinion in the record. (Doc. No. 15, pg. 15). ALJs are entitled to reject a treating physician's opinion with adequate explanation, and they are also entrusted with reviewing all of the evidence to formulate a claimant's RFC. *Titterington*, 174 F. App'x at 11. "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Id.*

### RFC Determination

Plaintiff's second argument is that the ALJ's RFC determination is unsupported by substantial evidence. After reiterating her initial argument that the ALJ should have afforded more weight to Dr. Hiller and Dr. Zillweger's opinions when she crafted her RFC, she further argues that the ALJ "totally failed to address the . . . opinion from June 2017 in which Karen Sarpolis M.D. was limited to a limited amount of light work." (Doc. No. 15, pg. 21). ALJs must consider all the evidence in the record and, in addition to explaining which evidence they relied upon, they must provide "an expression . . . of the evidence which was rejected." *Cotter*, 642

---

[10]    Plaintiff argues that the ALJ neglected to address Plaintiff's knee impairments in her discussion of how much credit she would afford Dr. Zillweger's opinion. (Doc. No. 15, pg. 15). The ALJ did however consider the objective medical evidence in the record of Plaintiff's knee impairments. (R. 716). And it is evident to the Court that the ALJ did not overlook Plaintiff's knee impairments; rather, the ALJ cited as much of the objective medical evidence as was necessary to explain why she found Dr. Zillweger's opinion inconsistent with other evidence in the record.

F.2d at 705. Unless ALJs explain why they rejected evidence, reviewing courts have no way of knowing "if significant probative evidence was not credited or simply ignored." *Id.* "State agent opinions" are recognized as evidence that generally "merit[s] significant consideration" owing to the State medical consultants' expertise in disability claims. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).

Plaintiff's record is, at this point, quite voluminous. In many respects, the ALJ's decision indicates her painstaking review of that record and thoughtful consideration of Plaintiff's case. However, her failure to address Dr. Sarpolis's opinion requires remand. Though Dr. Sarpolis's lift and carry limitations are consistent with the ALJ's RFC determination, Dr. Sarpolis further endorsed a four-hour limit for standing and walking and recommended total avoidance of pushing with her lower left extremity. (R. 933).[11] She also recommended postural limitations, *e.g.*, only occasional climbing and kneeling, no crawling or stooping. (R. 934). Presently, the Court has no way to know whether Dr. Sarpolis's opinion was "not credited or simply ignored." *Cotter*, 642 F.2d at 705. While Defendant argues it was appropriate for the ALJ to focus on earlier State agency opinions (Doc. No. 17, pg. 17), Plaintiff's cases were consolidated and it was incumbent upon the ALJ to attend to all of the evidence in the consolidated record. The Court will remand the matter for correction of this oversight and notes that any rejection of Dr. Sarpolis's opinion must be accompanied by an explanation that is sufficient to facilitate review. *Cotter*, 642 F.2d at 705—06.

## V.      Conclusion

---

[11]      The Court also notes that while the ALJ gave an adequate explanation for not fully crediting Dr. Zillweger's opinion, on remand the ALJ should further explain her "appreciat[ion]" of Dr. Zillweger's finding that Plaintiff is limited in sitting, standing, and walking. (R. 720). This is particularly important considering that Dr. Sarpolis also indicated a stand-and-walk limit would be appropriate.

For the foregoing reasons, the Court finds the ALJ's decision is not supported by substantial evidence. Accordingly, the Court hereby remands this matter to the Commissioner for reconsideration consistent with this Order.

s/ Alan N. Bloch
United States District Judge

ecf:    Counsel of record